UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL ORVIS,

                            CASE NO. 08-CV-11541-DT
          Plaintiff,          JUDGE DAVID M. LAWSON
                            MAGISTRATE JUDGE PAUL J. KOMIVES

v.

DEPUTY HORNBUCKLE and
WAYNE COUNTY,

          Defendants,

_____/

**REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION TO
DISMISS AND FOR SUMMARY JUDGMENT (Doc. Ent. 33)**

I.       **RECOMMENDATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.      REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
       A.    The Original Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
       B.    Plaintiff's Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
       C.    Defendants' Dispositive Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
       D.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
            1.    Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
            2.    Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
       E.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            1.    Defendant Hornbuckle is entitled to summary judgment on Count I: 42 U.S.C. § 1983
                claim against defendant Hornbuckle. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            2.    Defendant Wayne County is entitled to dismissal as to Count II: 42 U.S.C. § 1983 claim
                against defendant Wayne County. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
            3.    Defendants are entitled to summary judgment on Count III: Gross negligence against all defendants.
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

III.     NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

I.      **RECOMMENDATION:**  The Court should grant defendants' motion to dismiss and for summary judgment (Doc. Ent. 33).

II.     **REPORT:**

A.      **The Original Complaint**

Carl Orvis is currently incarcerated at Parnall Correctional Facility (SMT) in Jackson, Michigan.  He is serving a sentence for a July 3, 2006 assault with intent to do great bodily harm less than murder, Mich. Comp. Laws § 750.84.  Case No. 0608343-01 (Wayne County); www.michigan.gov/corrections, "Offender Search."

On April 10, 2008, while incarcerated at Kinross Correctional Facility (KCF) in Kincheloe, Michigan, Orvis filed a pro se prisoner civil rights complaint regarding a July 21, 2006 incident at the Wayne County Jail (WCJ).  Plaintiff alleges a portion of his right ring finger was cut off when it was caught between cell bars.  Plaintiff listed Wayne County Deputy Hornbuckle and the Detroit Medical Center (DMC) as defendants, as well as "unknown names[.]"  Doc. Ent. 1 at 1, 3.[1]  Defendant Hornbuckle answered the complaint on May 20, 2008.  Doc. Ent. 6.

Judge Lawson referred this case to me for general case management.  Doc. Ent. 7.  On June 9, 2008, I entered a scheduling order which set the discovery deadline for September 5, 2008 and the motion deadline for October 6, 2008.  Doc. Ent. 10.

---

[1]Attached to this complaint are copies of a letter plaintiff wrote to WCJ (Doc. Ent. 1 at 4); a March 5, 2008 letter from the Wayne County Sheriff's Department (WCSD) regarding plaintiff's January 27, 2008 Freedom of Information Act (FOIA) request (Doc. Ent. 1 at 5); a witness statement from Prentis Jones (#243384) (Doc. Ent. 1 at 6); and a three-page statement of facts dated March 1, 2008, which includes allegations that the DMC was negligent and violated plaintiff's right to a second opinion (Doc. Ent. 1 at 7-9).

On August 13, 2008, defendant Hornbuckle filed a motion seeking a Court order to allow the deposition of plaintiff, then an inmate at KCF.  Doc. Ent. 13.  On September 12, 2008, I entered an order denying without prejudice defendant Hornbuckle's motion seeking a court order to depose plaintiff.  Doc. Ent. 14.

Also on September 12, 2008, I entered an order conditionally granting plaintiff's motion to appoint counsel[2] and vacating the June 9, 2008 scheduling order.  Doc. Ent. 15.  On May 29, 2009, attorney Colleen H. Burke entered an appearance on plaintiff's behalf.  Doc. Ent. 17.  On June 10, 2009, Judge Lawson entered an order assigning pro bono counsel pursuant to 28 U.S.C. § 1915(e)(1).  Doc. Ent. 18.

**B.      Plaintiff's Amended Complaint**

On July 9, 2009, a stipulated order was filed granting leave to plaintiff for purposes of filing a first amended complaint and adding defendants.  Doc. Ent. 19.  On July 20, 2009, I entered an order granting leave to amend the complaint and add defendants.  Doc. Ent. 20.

The following day, on July 21, 2009, plaintiff filed an amended complaint, through counsel, in which he named Hornbuckle and Wayne County as defendants.  Among other things, plaintiff alleges:

> On July 21, 2006 at approximately 9:00 am, Plaintiff was asleep in his cell at the [WCJ].  He was positioned on this cell bunk with his head directed toward and within inches of the cell bars.  His head was cradled by his arms and his right hand was extended towards the cell bars.  The cell door was in the open position just prior to Plaintiff's incident.
>
> The cell doors customarily remain open during the day until approximately 10:00 pm.

---

[2]On August 7, 2008, plaintiff filed a motion for appointment of counsel for discovery.  Doc. Ent. 11.  Defendant Hornbuckle filed a response on August 13, 2008.  Doc. Ent. 12.

> Without any audible warning or announcement, the cell doors were activated and began to close. The first attempt at closing the cell doors failed and the doors were immediately activated again to close.
>
> Before Plaintiff was able to move his hand, the second attempt at closing the cell doors was made and during this attempt, a portion [of] Plaintiff's right ring finger was severed by the moving door.
>
> Plaintiff was taken to Detroit Receiving Hospital. Doctors were unable to re-attach Plaintiff's finger tip due to the severity of the injury. Plaintiff's amputated finger tip was crushed so severely, that it could not even be used as a skin graft.

Doc. Ent. 21 ¶¶ 8-12.

The causes of action allege a 42 U.S.C. § 1983 claim against each defendant and a gross negligence claim against both defendants. Doc. Ent. 21. His listed injuries include traumatic amputation of his right ring finger, physical pain and suffering, mental anguish, denial of social pleasure and enjoyment, embarrassment, humiliation or mortification. Doc. Ent. ¶¶ 20, 29, 33. Defendants Wayne County and Hornbuckle answered the first amended complaint on September 21, 2009. Doc. Ent. 23.

A pretrial conference was noticed for January 11, 2010. Doc. Ent. 24. On that day, I entered a scheduling order setting the discovery deadline for May 15, 2010 and the dispositive motion deadline for June 15, 2010. Doc. Ent. 25. On March 15, 2010, I entered a stipulated order compelling the deposition of plaintiff Orvis, then incarcerated at SMT. Doc. Ent. 29.

On June 4, 2010, I entered a stipulated order extending scheduling order dates. Specifically, the discovery and dispositive motion deadlines were extended sixty (60) days. Doc. Ent. 30.

**C.      Defendants' Dispositive Motion**

4

Currently before the Court is defendants' August 12, 2010 motion to dismiss and for summary judgment. Doc. Ent. 33.[3]  Generally, defendants' dispositive motion relies upon the deposition of plaintiff Orvis (Doc. Ent. 33-2); the deposition of Deputy Hornbuckle (Doc. Ent. 33-9); the deposition of Cpl. James Heron (Doc. Ent. 33-11); the deposition of Lt. Evelyn Hale-Taylor (Doc. Ent. 33-12); and WCJ's policy on inmate lockdown (Doc. Ent. 33-13).  Doc. Ent. 33 at 10-16.  Defendants contend that "[b]ecause the injury to Orvis was unintentional, there is no basis in law to impose liability against the individual officer or Wayne County."  Doc. Ent. 33 at 16.

Specifically, defendants argue:

I.      Regardless of whether Plaintiff's § 1983 claim is based upon a pure 14th Amendment Due Process violation, or an 8th Amendment/14th Amendment violation, the claim fails because (1) the federal courts do not recognize any right to recover under the 14th Amendment for an accidental injury and; (2) there is no evidence that Deputy Hornbuckle had the express intent to punish Orvis without due process of law[.]

II.     Plaintiff's gross negligence claim fails under Fec. R. Civ. P. 56(C) because there is no evidence that the Deputy's conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury would result, and because Plaintiff's own negligence was the proximate cause of the injury[.]

III.    Because Plaintiff cannot establish that a constitutional violation was committed by an individual governmental actor, any remaining § 1983 claim against a municipality fails under the holding of *City of Los Angeles v. Heller*, 475 U.S. 796 (1986) and is properly dismissed pursuant to [Fed. R. Civ. P.] 12(b)(6)[.]

---

[3]On August 25, 2010, defendants filed an errata sheet regarding the motion and motion brief captions (Doc. Ent. 33 at 1-2), Exhibit 1 (Doc. Ent. 33-2) and Exhibit 5 (Doc. Ent. 33-7).  Doc. Ent. 34.  Attached are corrected case captions (Doc. Ent. 34-1 at 1-2), Orvis's complete deposition transcript (Doc. Ent. 34-2 at 1-14) and a copy of the cell door photograph marked by Orvis during his deposition (Doc. Ent. 34-3).

Doc. Ent. 33 at 3.

On September 3, 2010, plaintiff filed a seventeen (17) page response. Doc. Ent. 35.[4] On November 10, 2010, plaintiff filed a nineteen (19) page amended response (Doc. Ent. 37), to which the transcript of Jeriel Heard's October 11, 2010 deposition is attached.[5]

**D.    Applicable Law**

Defendants' August 12, 2010 dispositive motion is brought pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56(c). Doc. Ent. 33 at 8-9.

**1.    Fed. R. Civ. P. 12(b)(6)**

Fed. R. Civ. P. 12(b)(6) provides that "[e]very defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion: (6) failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). "A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, and opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion." Fed. R. Civ. P. 12(b).

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under

---

[4]On September 17, 2010, I entered a stipulated order permitting plaintiff to amend his response "within thirty (30) days from the completion of Chief Jeriel Heard's deposition." Doc. Ent. 36.

[5]The September 3, 2010 response and the November 10, 2010 response differ in the length of Section D (Doc. Ent. 35 at 16, Doc. Ent. 37 at 16-18) due to the latter response's use of the Heard deposition transcript (Doc. Ent. 37-1).

Rule 56.  All parties must be given a reasonable opportunity to present all the material that is

pertinent to the motion."  Fed. R. Civ. P. 12(d) ("Result of Presenting Matters Outside the

Pleadings.").

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to

relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(citations and quotations omitted).  "Factual allegations must be enough to raise a right to relief

above the speculative level, . . . on the assumption that all the allegations in the complaint are

true[.]"  *Bell Atlantic Corp.*, 550 U.S. at 555 (citations and quotations omitted).  It is not enough

that "the pleadings [leave] open the possibility that a plaintiff might later establish some 'set of

[undisclosed] facts' to support recovery."  *Id.* at 561.  "[O]nce a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the

complaint."  *Id.* at 563.  "[W]e do not require heightened fact pleading of specifics, but only

enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.  Claims should be

"nudged . . . across the line from conceivable to plausible" to avoid dismissal.  *Id.  See also

Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950-1951 (2009) ("respondent's complaint has not 'nudged

[his] claims' of invidious discrimination 'across the line from conceivable to plausible.'")

(quoting *Bell Atlantic Corp.*).

The reviewing court must construe the complaint in the light most favorable to plaintiff

and must presume all factual allegations in the complaint as true.  *See Morgan v. Church's Fried

Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).  The purpose of Rule 12(b)(6) is to give defendant the

7

opportunity to test whether plaintiff is entitled to legal relief as a matter of law even if everything

alleged in the complaint is true. *See Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). "The

Federal Rules reject the approach that pleading is a game of skill in which one misstep by

counsel may be decisive to the outcome and accept the principle that the purpose of pleading is

to facilitate a proper decision on the merits." *Conley v. Gibson*, 355 U.S. 41, 48 (1957),

*overruled on other grounds by Bell Atlantic Corp.*, 550 U.S. at 554-563. A dismissal under Rule

12(b)(6) is generally disfavored by courts, as it is a dismissal on the merits. 2A JAMES W.

MOORE, MOORE'S FEDERAL PRACTICE ¶ 12.07 (2d ed. 1995).

## 2.    Fed. R. Civ. P. 56

Rule 56(b) provides that "[a] party against whom relief is sought may move, with or

without supporting affidavits, for summary judgment on all or part of the claim."

Summary judgment, pursuant to Fed. R. Civ. P. 56, may be granted "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> A fact is 'material' and precludes grant of summary judgment if proof of that fact
> would have [the] effect of establishing or refuting one of [the] essential elements
> of a cause of action or defense asserted by the parties, and would necessarily
> affect [the] application of appropriate principle[s] of law to the rights and
> obligations of the parties.

*Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis,* 542 P.2d

867, 872 (Wyo. 1975) (quoting BLACK'S LAW DICTIONARY 881 (6th ed.1979)). "In

evaluating a motion for summary judgment we view all evidence in the light most favorable to

8

Plaintiff . . . and assess the proof to determine whether there is a genuine need for trial." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1045 (6th Cir. 1998) (citations omitted).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986). The moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party discharges that burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine triable issue. Fed. R. Civ. P. 56(e); *Gregg*, 801 F.2d at 861.

"Although the nonmoving party 'may not rest upon the mere allegations or denials' of his pleading, Fed. R. Civ. P. 56(e), a verified complaint . . . satisfies the burden of the nonmovant to respond." *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999).[6] "[A] verified complaint . . . would have the same force and effect as an affidavit and would give rise to genuine issues of material fact." *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992). However, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). *See also Hamilton v. Roberts*, No. 97-1696, 1998 WL 639158, *5 (6th Cir. Sept. 10, 1998) (personal knowledge required); *Daniel v. Cox*, No. 96-5283, 1997 WL 234615, *2 (6th Cir. May 6, 1997) (conclusory assertions are insufficient for purposes of surviving summary judgment); *Wiley v. United States*,

---

[6]Plaintiff's original complaint was signed under penalty of perjury. Doc. Ent. 1 at 3.

9

20 F.3d 222, 226 (6th Cir. 1994) (citing *Daily Press, Inc. v. United Press Int'l*, 412 F.2d 126,

133 (6th Cir. 1969)) (cannot consider hearsay evidence).

　　　"Demonstration of simply 'metaphysical doubt as to the material facts' is insufficient."

*Kand Medical, Inc. v. Freund Medical Products, Inc.*, 963 F.2d 125, 127 (6th Cir. 1992), citing

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  As the

United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986),

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for

a jury to return a verdict for that party.  If the [non-movant's] evidence is merely colorable, or is

not significantly probative, summary judgment may be granted."  *Id.* at 246-250 (citations

omitted); *see Celotex Corp.*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co., Ltd. v. Zenith

Radio Corp.*, 475 U.S. 574, 586-587 (1986).  The standard for summary judgment mirrors the

standard for a directed verdict under Fed. R. Civ. P. 50(a).  *Anderson*, 477 U.S. at 250.

Consequently, a non-movant must produce evidence that would be sufficient to require

submission to the jury of the dispute over the fact.

**E.　　Analysis**

**1.　　Defendant Hornbuckle is entitled to summary judgment on Count I: 42 U.S.C. §
1983 claim against defendant Hornbuckle.**

　　　Plaintiff's Fourteenth Amendment claim against Hornbuckle (¶¶ 13-20) is based upon

alleged deliberate indifference, reckless disregard, gross negligence and/or reckless indifference

to Orvis's health or safety.  Doc. Ent. 21 at 3 ¶¶ 15, 17, 18.

　　　Specifically, plaintiff alleges that Hornbuckle's "failure to announce the closing of the

cell block doors, insuring the clearance of the doors before closing, insuring the safety and

location of all inmates prior to closing the cell doors, designing the cell so that the position of the

10

cell bunk would not injure an inmate when the cell door was closed and/or employing any audible device that announces the closing of the cell block doors posed a substantial risk of serious harm to Plaintiff and demonstrated Defendant's deliberate indifference to Plaintiff's health, safety and welfare."  Doc. Ent. 21 at 3 ¶ 16.

Plaintiff further alleges that "by failing to insure the safety and location of all inmates prior to closing the cell doors and/or utilizing any audible device that announces the closing of the cell block doors, Defendant acted beyond ordinary lack of due care and with deliberate indifference to an obvious risk that unannounced and unscheduled closing of the cell door would jeopardize Plaintiff's safety and well-being."  Doc. Ent. 21 at 4 ¶ 17.  Plaintiff also contends that "[b]y the unscheduled closing of the cell doors without warning and without insuring the safety of the Plaintiff, Defendant Hornbuckle displayed a deliberate indifference to Plaintiff's health, safety and well-being, violating the due process clause of the Fourteenth Amendment and 42 U.S.C. § 1983."  Doc. Ent. 21 at 4 ¶ 18.

Plaintiff also lists the acts and/or omissions which allegedly violated his rights, among which is the allegation that Hornbuckle "[d]eliberately ignor[ed] the risk of injury to inmates by unannounced and/or unscheduled closing of the cell block doors[.]"  Doc. Ent. 21 at 4 ¶ 19(b).[7]

---

[7]Paragraph 19 contains several other alleged acts and/or omissions; however, these allegations - such as a failure to properly train or a failure to supervise - ring as applicable to defendant Wayne County in the form of a municipal liability claim.  *See* Doc. Ent. 21 ¶¶ 19a, 19c, 19d, 19e and 19f.

This interpretation is consistent with defendants' statement that Hornbuckle is a jail guard and "is not responsible for cell design, or for installation [of] audible warning devices."  Doc. Ent. 33 at 17 n.3.  It is also consistent with the beginning of Paragraph 19, wherein plaintiff alleges that "[t]he acts and/or omissions of each Defendant were committed under the color of state law and under the official or unofficial sanctioned policies, practices, regulations and/or customs of the [WCJ], [WCSD] and/or Wayne County."  Doc. Ent. 21 at 4 ¶ 19.

While there is no Eleventh Amendment bar to 42 U.S.C. § 1983 claims against state officials in their individual capacities, *Hafer v. Melo*, 502 U.S. 21, 30-31, 112 S. Ct. 358, 364 (1991), there

a.      Defendants argue that, "[i]f Plaintiff's 42 USC § 1983 action is analyzed as a pure 14th Amendment Due Process claim for an alleged failure to warn that the cell doors were closing, the claim fails as a matter of law."  Doc. Ent. 33 at 17.  In *Daniels v. Williams*, 474 U.S. 327 (1986), the Supreme Court held that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."  *Daniels v. Williams*, 474 U.S. 327, 328 (1986).  "For a claim brought under substantive due process where a non-fundamental right is implicated, the plaintiff must show that the conduct 'shocks the conscience' of the court."  *Howard v. Grinage*, 82 F.3d 1343, 1350 (6th Cir. 1996) (citing cases). In fact, "[g]ross negligence is not actionable under § 1983, because it is not 'arbitrary in the constitutional sense.'"  *Lewellen v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 34 F.3d 345, 351 (6th Cir. 1994) (citing *Collins v. City of Harker Heights, Tex.*, 112 S.Ct. 1061, 1071 (1992)).  "To establish a claim under section 1983 for a substantive due process violation, Collins requires a plaintiff to show conduct that is more egregious than 'gross negligence,' conduct that 'shocks the conscience[.]'"  *Smith v. Lexington Fayette Urban County Government*, 884 F.Supp. 1086, 1094 (E.D. Ky. 1995).

Defendants argue that "[t]he facts of this case fail to establish that Deputy Hornbuckle engaged in any conduct that 'shocks the conscience' and it is well settled that an accidental injury does not violate the 14th Amendment."  Therefore, defendants contend, the claim should

---

is no basis for holding Hornbuckle individually liable for WCJ, WCSD or Wayne County policy when he played no role in making the decision to implement such a policy. Without judging the merit of plaintiff's other claims against Hornbuckle, if Hornbuckle did violate plaintiff's constitutional rights, he would be liable in an individual capacity for such violations. *See Hafer*, 502 U.S. at 30-31. Such liability, however, would only exist for the violations that Hornbuckle committed, not for the unconstitutional WCJ, WCSD or Wayne County policy.

Therefore, this report and recommendation will address subparagraphs ¶ 19a, 19c, 19d, 19e and 19f in its discussion of the 42 U.S.C. § 1983 claim against Wayne County.

be dismissed under Fed. R. Civ. P. 12(b)(6).  Doc. Ent. 33 at 18.  However, because the arguments in plaintiff's November 10, 2010 response address only whether Hornbuckle's conduct was "grossly negligent" or "deliberately indifferent[,]" Doc. Ent. 37 at 12-18, this report interprets plaintiff's 42 U.S.C. § 1983 claim against Hornbuckle as based upon a pretrial detainee's Fourteenth Amendment rights which are analogous to prisoners' Eighth Amendment rights.  *See*, *i.e.*, *Barber v. City of Salem, Ohio*, 953 F.2d 232 (6th Cir. 1992).  If the Court agrees with this interpretation, it need not reach a conclusion with respect to a Fourteenth Amendment substantive due process claim.

**b.**     Defendants next argue that, if plaintiff's complaint "is analyzed under the 8th Amendment's prohibition against cruel and unusual punishment (*made applicable to pretrial detainees through the 14th Amendment*), the claim also fails because Plaintiff cannot show that Deputy Hornbuckle had the express intent to punish him without due process of law."  Doc. Ent. 33 at 19-20.

     As an initial matter, I note that the date of plaintiff's offense was July 3, 2006 and the date of his sentence was November 30, 2006.  *See* www.michigan.gov/corrections, "Offender Search."  Plaintiff's amended complaint is based upon a July 21, 2006 incident.  Doc. Ent. 21 ¶ 8.  Therefore, as plaintiff contends, he was a pretrial detainee at the time of the incident underlying this complaint.  Doc. Ent. 21 at 2 ¶ 3.

     "While a pretrial detainee does not enjoy protection of the Eighth Amendment, the Eighth Amendment rights of prisoners are analogous to pretrial detainees' due process rights under the Fourteenth Amendment."  *Barber v. City of Salem, Ohio*, 953 F.2d 232, 235 (6th Cir. 1992) (citing cases); *see also Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985) ("the

eighth amendment rights of prisoners are analogized to those of detainees under the fourteenth amendment, to avoid the anomaly of extending greater constitutional protection to a convict than to one awaiting trial.").

"In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, . . . the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535-536 (1979) (footnotes omitted). "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539. *See also Thompson v. County of Medina*, 29 F.3d 238, 242 (6th Cir. 1994).

**c.**      According to defendants, the facts alleged "do not involve the use of force but rather, a guard shutting the cell doors on a ward in order to inspect the showers."[8] It is defendants' position that "[t]here is no evidence to suggest that Deputy Hornbuckle's act of shutting the cell doors was an assault directed at the Plaintiff or an intended punishment." Defendants also contend "[t]here were nine other inmates on the ward who were not injured by the cell doors." In sum, defendants argue that "Orvis cannot establish the requisite proofs in order to show that his injury was the result of any intentional act or desire to punish him." Doc. Ent. 33 at 20.

**d.**      Generally, plaintiff responds that "Deputy Hornbuckle testified that he was well aware that inmates sometimes put their hands or appendages through the bars. He was also aware that

---

[8]During his deposition, Hornbuckle testified that he ordered a lockdown when he received complaints of crabs in the ward 606 shower. Doc. Ent. 33-9 pp. 57-58. Crab louse is "[a] species of louse, *Phthirius pubis*, which infests the region of the pubic hair." SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 1, C-388 (1995). *See also* Doc. Ent. 33 at 13 n.2.

14

the operation of the doors had caused injury to inmates in the past.  Despite this knowledge, he

operated the doors, at a time when they were not normally operated, without first ensuring that

the inmates were out of harm's way."  Doc. Ent. 37 at 7.

Plaintiff also reviews "[t]he door closing mechanism and the procedure for inmate

lockdown[,]" Doc. Ent. 37 at 8-10.  Plaintiff testified at his deposition that "[w]hen [Hornbuckle]

closed the bars he would have been standing around the corner behind the phone . . . on the other

side."  Plaintiff would not have been able to see Hornbuckle and Hornbuckle would not have

been able to see Plaintiff.  Doc. Ent. 33-2 p. 33.  *See also* Doc. Ent. 33-9 at 31-32 (Hornbuckle

Dep.).

Furthermore, plaintiff reviewed his injury.  Doc. Ent. 37 at 10-11.  According to plaintiff,

he was in his bed, on his stomach, with his head toward the bars, his hands crossed and his head

on his left arm.  The incident occurred at 9:00 a.m.  The doors were open, as normal.  Doc. Ent.

33-2 p. 22-25.  Corporal Herron testified that this lockdown was not routine.  Doc. Ent. 33-2 pp.

28-29.  Jail nurses had given plaintiff Remeron[9] and Depakote[10] around 8:00 p.m. the evening

before, and he woke up groggy.  Doc. Ent. 33-2 pp. 45-46.  Plaintiff testified that he "heard the

door move, moving and then it stopped. [Plaintiff] kind of looked up.  [He] [saw] the door wasn't

shut all the way and then [he] heard clinking again so [he] just laid [his] head back down and

then the door was forcibly opened again.  It came open with a force and it slammed against the

back wall and [he] could hear it boom and it made [plaintiff] jump a little bit.  And then [he] laid

---

[9]"REMERON SolTab ® (mirtazapine) Orally Disintegrating Tablets has been approved by the Food and Drug Administration for the treatment of major depressive disorders in adults."  *See* http://www.remeronsoltab.com/consumer/index.asp.

[10]Depakote is "[a] medicine used in the treatment of absence seizures (clouding of consciousness)."  SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 1, D-49 (1995).

[his] head back down and [he] could hear the doors closing again.  And then as it was closing, that's when [he] felt pressure on [his] finger."  Orvis "pulled [his] finger up and [he] realized what happened because [he] was cut and bleeding so [he] jumped up right away."  Doc. Ent. 33-2 p. 24.  He tried to yell, but "nothing was coming out of [his] voice."  Doc. Ent. 33-2 p. 26.  He stuck his head out but came back in because the door was "so close to shutting[.]" Doc. Ent. 33-2 p. 24-25.  When the door was closed, plaintiff was able to yell, "open the doors, open the doors. My finger's been cut off."  Doc. Ent. 33-2 p. 26.  His right ring finger was severed at the first knuckle.  Doc. Ent. 33-2 p. 22.

Plaintiff specifically responds that "[t]here is a question of material fact regarding whether Deputy Hornbuckle was deliberately indifferent."  In so doing, plaintiff refers to Hornbuckle's deposition testimony.  Doc. Ent. 37 at 15.  Hornbuckle noted that when he is running the bars he looks down the ward, because inmates "hold onto the bars and play with the bars . . . [a]nd you can actually see the hands on the bars all the way down to cell 10."  Doc. Ent. 33-9 p. 35-36.  He testified that he has heard of "inmates being injured due to the operation of the door[,]" such as arms getting stuck in between the door bar or a head getting caught between the bars.  He had also heard of "bones being broken because of the operation of the doors[.]" Doc. Ent. 33-9 p. 64.[11]  He also agreed that the doors "could cause physical injury because of their weight[,]" and that he knew the doors "had the potential to cause bodily harm[.]"  Doc. Ent. 33-9 pp. 36, 65.  According to plaintiff, "[d]espite this knowledge, [Hornbuckle] closed the prison doors at a time when they were not normally closed, without checking to make sure that

---

[11]Lieutenant Hale-Taylor stated there may have been another incident of a severed body part; she is "well aware that these doors can cause serious injury[,]" and she has "heard of incidents of injury at the division II jail[,]" and its not rare for an injury to occur.  Doc. Ent. 33-12 pp. 26, 48.

all inmates were awake and had all of their appendages inside the cell and away from areas where the doors would cause injury." Doc. Ent. 37 at 14.

Hornbuckle stated that "when [h]e yell[s] out [his] verbal commands [he] tell[s] them stand clear of the bars." He pauses to ensure that the inmates have heard him. Doc. Ent. 33-9 at 44. When asked, "[d]o you ever check to make sure there aren't some inmates that are sleeping that haven't heard you[,]" Hornbuckle explained, "[t]he only time we close the bar they're not asleep[,]" and "even if they were asleep, their hands and limbs cannot get caught in the bars. It's impossible." Doc. Ent. 33-9 at 44-45. Hornbuckle further testified that he does not "require any sort of confirmation from the inmates that they have in fact heard [Hornbuckle] and have acknowledged that the bars will be closing[.]" Doc. Ent. 33-9 pp. 45.

Also, Hornbuckle testified that he cannot see "from the angle that [he] would be at [he] can't see into the cells, [he] can't see the cells face on[.]" Doc. Ent. 33-9 pp. 36-37. On the day in question, Hornbuckle stated, "[t]here was no officer on the catwalk," and he agreed that "there was no officer who had the viewpoint of looking [directly] into the cells[.]" Doc. Ent. 33-9 pp. 68-69. According to plaintiff, "[a]ll of this creates a question of fact on the issue of whether [Hornbuckle] was deliberately indifferent. This is an issue for the jury to decide." Doc. Ent. 37 at 15.

**e.**      Upon consideration, the Court should conclude that defendant Hornbuckle is entitled to summary judgment on plaintiff's 42 U.S.C. § 1983 Fourteenth Amendment claim. "The Supreme Court has defined 'deliberate indifference' as being more than mere negligence but less than acting with purpose or knowledge." *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). "Instead, the prison official must

have acted with a state of mind similar to recklessness." *Jones*, 625 F.3d at 941 (citing *Farmer*, 511 U.S. at 836). "[T]o prove the required level of culpability, a plaintiff must show that the official: (1) subjectively knew of a risk to the inmate's health, (2) drew the inference that a substantial risk of harm to the inmate existed, and (3) consciously disregarded that risk." *Id.* (citing *Farmer*, 511 U.S. at 837).

I arrive at this recommendation based upon several factors, the first being deposition testimony. At his July 15, 2010 deposition, Hornbuckle stated that he was hired by the WCSD in 2001. Doc. Ent. 33-9 pp. 8-9. He stated that, "[s]everal times or more" he called out that the bars were closing. Doc. Ent. 33-9 pp. 59-60. He also stated that he "pushed . . . the clutch in, that way they know that I'm about to do something." Doc. Ent. 33-9 p. 65. According to Hornbuckle, Orvis stuck his head out, Hornbuckle said lockdown, and Orvis "stuck his head back in." Doc. Ent. 33-9 pp. 65-66. Then, Hornbuckle "started to engage the clutch and close the bars." The doors closed all the way before Hornbuckle realized that Orvis was injured. Doc. Ent. 33-9 p. 67. Hornbuckle opened Orvis's cell door when he heard Orvis. Doc. Ent. 33-9 pp. 69-70, 72. Orvis came out of his cell, started walking to the sally port and Hornbuckle noticed Orvis holding his hand. Doc. Ent. 33-9 p. 71. Hornbuckle told Herron to activate the duress alarm. Doc. Ent. 33-9 at 72. Hornbuckle testified that he did not intend for this incident to happen, he did not want this injury to occur, and he (Hornbuckle) was upset. Doc. Ent. 33-9 pp. 90-91.

At his July 15, 2010 deposition, Corporal James Heron described the noise when the doors are opened and closed as "loud." Doc. Ent. 33-11 p. 48. Heron was asked, "How many times did [Hornbuckle] notify the inmates that he was about to or is closing the cell doors?"

18

Heron replied, "I would say between two to three times." Doc. Ent. 33-11 p. 30. Heron did not

remember anyone sounding the duress alarm, but he stated that either he or Hornbuckle notified

the medical staff that attention was needed. Doc. Ent. 33-11 pp. 40-41.

During his April 16, 2010 deposition, plaintiff testified that he was in cell nine and

estimated that he was sixty (60) feet from the guard door "where they would open and shut the

doors[.]" Doc. Ent. 33-2 at 30. Plaintiff did not remember Hornbuckle saying anything.

Plaintiff was asked, "[i]s it possible that [Hornbuckle] called it out and you didn't hear it because

of the medication you were on?" Plaintiff answered, "Possible I guess." Doc. Ent. 33-2 p. 26.

Also, the following exchange took place:

> Q.   Do you have any evidence that [Hornbuckle] intended for this to happen
>       to you?
> A.   I don't know what you mean by that.
> Q.   Well if you have a deputy that means to hurt you, let's say means to punch
>       you in the head and he goes and punches you in the head, the evidence
>       that you would have that he intended to hurt you is that he punched you.
> A.   No, I don't have any evidence.

Doc. Ent. 33-2 p. 35. Additionally, plaintiff stated he was truthful in his interview with Internal

Affairs, a tape-recorded portion of which was played at the deposition.[12] Therein, plaintiff

stated, among other things, "I know I'm sure the deputy didn't mean to do it[,]" and "he's a

really nice guy." Doc. Ent. 33-2 pp. 35-38.[13]

And, Lieutenant Evelyn Hale-Taylor testified that she "clearly remember[ed] [Orvis]

saying it was not Officer Hornbuckle's fault." Doc. Ent. 33-12 p. 36.

---

[12]Attached to defendants' August 12, 2010 dispositive motion is a CD recording of Orvis's partial Internal Affairs Interview. Doc. Ent. 33-3; *see also* Doc. Ent. 33 at 11 n.1.

[13]During the April 16, 2010 deposition, plaintiff confirmed that he "just heard the recorded interview of [Sergeant Prior] asking [plaintiff] questions and [plaintiff] giving answers." Doc. Ent. 33-2 p. 38.

Second, I am persuaded by the case law.  Defendants rely on *Hickman v. Hudson*, 557 F.Supp. 1341 (W.D. Va. 1983), wherein the Court considered "whether plaintiff's allegation that a jailer negligently closed a cell door on his hand states a claim under the eighth amendment." *Hickman*, 557 F.Supp. at 1345.  In concluding that plaintiff had not stated an Eighth Amendment claim, the Court observed: "Plaintiff alleges only that an officer negligently closed a cell door on his hand. There is no allegation that even suggests that inmates at the Roanoke City Jail face a pervasive risk of harm from having cell doors closed on their hands. Nor is there any indication in plaintiff's complaint or affidavit of a sustained knowing maintenance of inadequate training of jailers in the proper procedure for closing cell doors." *Id*.  After citing *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976),[14] the Court analogized that "a personal injury resulting from a negligent act does not violate the eighth amendment merely because the victim is a prisoner[,]" and concluded that "the alleged negligent closing of a cell door on plaintiff's hand does not state a claim under the [E]ighth [A]mendment." *Id*. at 1346.

Defendants also rely on *Fisher v. Britt*, No. 85-3736, 1985 WL 3367 (E.D. Pa. 1985), wherein plaintiff alleged "only that defendant closed a cell door on his fingers." *Fisher*, 1985 WL 3367, *1.  The Court observed:  "[t]he complaint is devoid of any evidence that defendant's act was intentional, done solely for the purpose of inflicting unnecessary pain upon plaintiff. Instead, it appears that the injury to plaintiff's fingers was nothing more than an unfortunate accident." *Id*.  After citing *Hickman*, the Court stated, "the accidental closing of a cell door on plaintiff's fingers fails to state a cause of action under § 1983[.]"  *Fisher*, 1985 WL 3367, 1.

---

[14]"An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Estelle*, 429 U.S. at 105.

Also, defendants rely upon *United States ex rel. Miller v. Twomey*, 479 F.2d 701 (7th Cir.

1973), wherein the Court noted that "the allegation that defendants Riley and Kennedy were

negligent in their supervision of the Mechanical Store on *one occasion* is insufficient to establish

that they inflicted 'punishment' on Gutierrez." *U.S. ex rel. Miller*, 479 F.2d at 720 (emphasis

added). Furthermore, the Court stated, "plaintiff has alleged that an erroneous decision was

made; even assuming that error is attributable to negligence, in our opinion that allegation is

insufficient to describe a violation of the Eighth Amendment." *U.S. ex rel. Miller*, 479 F.2d at

721.

In addition to the cases cited by defendants, I am persuaded by two cases from the Sixth

Circuit. In *Ritchie v. Wickstrom*, 938 F.2d 689 (6th Cir. 1991), "plaintiff's leg was injured when it

was caught in the cell door that was being automatically closed by defendant Wickstrom, a

correctional officer at the Marquette facility[,]" and the Sixth Circuit concluded that "the only

wrongful acts that possibly could be attributed to defendant Wickstrom are acts of negligence.

Negligence will not ground a section 1983 action." *Ritchie*, 938 F.2d at 692 (citing *Daniels v.

Williams*, 474 U.S. 327 (1986)).

Also, in *Thompson v. Shelby County, Tenn.*, No. 83-5365, 1985 WL 13560 (6th Cir. Aug.

12, 1985), the Sixth Circuit stated: "Thompson's [E]ighth [A]mendment claim is without merit.

The pleadings allege only that the jailers knew or should have known that the cell door was not

functioning properly and/or that they were negligent in closing the door while Thompson was

standing in the doorway. This is hardly the kind of 'deliberate indifference' to Thompson's

rights that is necessary to state an eighth amendment claim for injuries incurred while

21

incarcerated." *Thompson*, 1985 WL 13560 at 1 n.2 (referencing *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)).

Based upon the above-cited deposition testimony and cases, the Court should conclude that defendant Hornbuckle is entitled to summary judgment on plaintiff's 42 U.S.C. § 1983 claim against him.

**2.    Defendant Wayne County is entitled to dismissal as to Count II: 42 U.S.C. § 1983 claim against defendant Wayne County.**

a.      In his amended complaint, plaintiff explains that "[d]efendant Wayne County established, operated, and/or maintained a jail known as the [WCJ] located in the City of Detroit, County of Wayne, State of Michigan."  Doc. Ent. 21 at 2 ¶ 5.  Plaintiff also claims that "[a]t all material times, Defendant Wayne County employed Defendant Hornbuckle and is liable for his acts." Doc. Ent. 21 at 2 ¶ 7.

Plaintiff's Fourteenth Amendment claim against Wayne County (¶¶ 21-29) mirrors plaintiff's Fourteenth Amendment claim against Hornbuckle.  *Compare* Doc. Ent. 21 ¶¶ 13-20 with Doc. Ent. 21 ¶¶ 21-25, 27-29.  Here, too, plaintiff's claim against defendant Wayne County is based upon alleged deliberate indifference, reckless disregard, gross negligence and/or reckless indifference to plaintiff's health or safety.  Doc. Ent. 21 ¶¶ 23, 25, 27; *see also* Doc. Ent. 21 ¶¶ 15, 17, 18.

As was the case in the claim against Hornbuckle, plaintiff's claim against Wayne County takes issue with the failure to "design[] the cell so that the position of the cell bunk would not injure an inmate when the cell door was closed and/or employ[] any audible device that announces the closing of the cell block doors[,]" which "posed a substantial risk of serious harm to Plaintiff and demonstrated [defendant Wayne County's] deliberate indifference to Plaintiff's

health, safety and welfare." Doc. Ent. 21 ¶ 24; *see also* Doc. Ent. 21 ¶ 16. Plaintiff also alleges that defendant Wayne County employed, implemented and/or executed "unconstitutional policies, practices and/or customs that fail[ed] to take into account the health and safety of Plaintiff." Specifically, plaintiff contends, defendant Wayne County "fail[ed] to insure the safety and location of all inmates prior to closing the cell doors and/or utilizing any audible device that announces the closing of the cell block doors[.]" In plaintiff's words, defendant Wayne County "acted beyond ordinary lack of due care and with deliberate indifference to an obvious risk that unannounced and unscheduled closing of the cell door would jeopardize Plaintiff's safety and well-being." Doc. Ent. 21 ¶ 25; *see also* Doc. Ent. 21 ¶ 17. And, plaintiff alleges that defendant Wayne County was deliberately indifferent to plaintiff's health, safety and well-being, "[b]y the unscheduled closing of the cell doors without warning and without insuring the safety of the Plaintiff[.]" Doc. Ent. 21 ¶ 27; *see also* Doc. Ent. 21 ¶ 18.

However, the claim against Wayne County includes the additional allegation that defendant Wayne County "further violated Plaintiff's aforementioned constitutional rights by failing to implement and adopt appropriate policies and procedures that would ensure proper instruction, training and supervision of those responsible for the operation of the cell block doors." Doc. Ent. 21 at 7 ¶ 26.

Furthermore, as was the case with the claim against Hornbuckle, plaintiff lists several alleged acts and/or omissions by defendant Wayne County, committed "under the official or unofficial sanctioned policies, practices, regulations and/or customs of the [WCJ], [WCSD] and/or Wayne County[,]" such as:

> [f]ailing to properly train [WCJ] personnel to ensure the safety and well-being of inmates when operating the cell block doors;

23

[d]eliberately ignoring the risk of injury to inmates by unannounced and/or unscheduled closing of the cell block doors;

[k]nowingly and recklessly hiring, training and maintaining competent staff at the [WCJ];

[d]eliberately and recklessly failing to supervise those employed with the responsibility of ensuring the safety and well-being of inmates while operating the cell block doors;

[f]ailing to develop and implement appropriate policies and procedures to prevent injury to inmates at the time of unanticipated closure of cell doors in the jail; and

[a]llowing the maintenance and implementation of a custom, practice or policy by personnel fo the [WCH] that deliberately ignored the health, welfare and well-being of inmates similarly situated as Plaintiff.

Doc. Ent. 21 at 7-8 ¶¶ 28(a), 28(b), 28(c), 28(d), 28(e), 28(f); *see also* Doc. Ent. 21 ¶19.

**b.**      Defendants argue that "[b]ecause Plaintiff cannot establish that a constitutional violation was committed by an individual governmental actor, any remaining § 1983 claim against a municipality fails under the holding of *City of Los Angeles v. Heller*, 475 U.S. 796 (1986) and is properly dismissed pursuant to [Fed. R. Civ. P.] 12(b)(6)."  Doc. Ent. 33 at 23-24.  In other words, citing ¶ 28 of the amended complaint, defendants claim that "Plaintiff cannot establish any actionable claim against Deputy Hornbuckle under 42 USC § 1983[.]" Therefore, "he cannot prevail on any claim alleging municipal liability against Wayne County for maintaining unconstitutional custom, practices or policies."  Doc. Ent. 33 at 24.

Generally, plaintiff responds that, despite the institution of the policy regarding inmate lockdown, "Wayne County did not do *anything* to ensure that the policy [was] followed." Plaintiff alleges that "[t]he officers were not trained with respect to the correct procedures to operate the mechanism."  In fact, plaintiff claims, "the officers didn't even know that the policy

24

existed and regularly operated the locking mechanism without an officer on the catwalk, putting the inmates in danger.  This is exactly what happened in this case."  Doc. Ent. 37 at 7. According to Corporal James Herron, there is no "safety guard . . . where if the doors are closing if it feels some sort of resistance they automatically open back up[.]" Doc. Ent. 33-11 p. 15. According to Hornbuckle, Corporal Herron was with him (Hornbuckle) when he ordered the lockdown, and "[t]here was no officer on the catwalk[.]" Doc. Ent. 33-9 pp. 59, 68.  Hornbuckle had not seen the inmate lockdown procedure, had not been told it was policy or procedure to have an officer on the catwalk during lockdown and had not been advised by a supervisor that the manner in which he performs lockdowns is incorrect (Doc. Ent. 33-9 p. 86-87); Herron stated he "wasn't always aware" that it is "part of the regular procedure that there is an officer on the catwalk when the cell doors are being operated[,]" and he agreed he has "operated the cell doors when there is no one standing on the catwalk looking into the cells to watch the inmates[,]" Doc. Ent. 33-11 pp. 20-21; and Hale-Taylor testified she was not aware that the direction to have an officer on the catwalk was in the policy (Doc. Ent. 33-12 p. 23-24).

Plaintiff also claims that the medication "made him groggy and unable to fully appreciate what was going on around him."  Doc. Ent. 37 at 7.  However, plaintiff claims, no information that Orvis was on such medication was supplied to the officers.  Doc. Ent. 37 at 8.  Hornbuckle confirmed that "[i]f an inmate is given medication on a shift that [Hornbuckle] [is] not working [he is not] made aware of the medication that [the prisoner] take[s][.]"  Doc. Ent. 33-9 p. 22. Hale-Taylor testified that information about inmates being on medication that may cause drowsiness or may cause him to sleep would be helpful to know but is not relayed to the officers. Doc. Ent. 33-12 p. 28-29.  Herron thought it could be important "to learn if an inmate is taking a

25

medication that would cause them to . . . sleep where they couldn't hear [directions] such as the bars are closing[.]" Doc. Ent. 33-11 p. 22.

Specifically, plaintiff responds that "[d]efendants' *only* argument relative to Wayne County is that Deputy Hornbuckle did not violate Mr. Orvis's constitutional rights.  Because there is a question of fact on this issue, summary judgment with respect to Wayne County is precluded."  Doc. Ent. 37 at 16-18.  Plaintiff explains, "Wayne County had a policy in place with respect to inmate lockdown procedures, which it did not direct its employees to follow.  The employees regularly closed the doors without an officer on the catwalk for safety, and despite the fact that inmates have been injured by the doors in the past, it failed to train its employees with respect to the policy or even ensure that they were informed of the policy."  Doc. Ent. 37 at 16.  Also, plaintiff relies upon the October 11, 2010 deposition of Jeriel Heard, Chief of Jails and Courts in the Wayne County Sheriff's office.  Doc. Ent. 37-1.  In the end, plaintiff argues that "[t]he customs and practices of Officer Hornbuckle and the [WCSD] in failing to implement the lockdown procedure in its entirety amount to the deliberate indifference for the safety and well-being of the inmates."  Doc. Ent. 37 at 18.

**c.**    Upon consideration, the Court should conclude that defendant Wayne County is entitled to dismissal of plaintiff's 42 U.S.C. § 1983 Fourteenth Amendment claim.  "[A] municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978).  "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose

edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

"A plaintiff asserting a section 1983 claim on the basis of a municipal custom or policy must "identify the policy, connect the policy to the [County] itself and show that the particular injury was incurred because of the execution of that policy." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993). "There must be 'a direct causal link' between the policy and the alleged constitutional violation such that the County's 'deliberate conduct' can be deemed the 'moving force' behind the violation." *Graham,* 358 F.3d at 383 (citing cases).

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-389 (1989). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983. . . . Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality-a 'policy' as defined by our prior cases-can a city be liable for such a failure under § 1983." *Id*.

However, "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." *City of Los Angeles*, 475 U.S. at 799; *see also Claybrook v. Birchwell*, 199 F.3d 350, 361 (6th Cir. 2000) ("because the charged official conduct did not inflict any constitutional deprivation upon Quintana, defendant Kirchner,

27

in his official capacity as the Chief Executive Officer of the Nashville-Davidson County Metropolitan Police Department, cannot be liable to her for any alleged neglect to train or supervise those officers, or failure to develop appropriate deadly force policies; therefore the lower court's summary dismissal of count four was also proper.") (citing *City of Los Angeles*, 475 U.S. at 799); *Burris v. Thorpe*, 166 Fed.Appx. 799, 803 (6th Cir. 2006) ("a municipality can only be held liable under § 1983 if the officer inflicted a constitutional deprivation.") (citing cases).

Defendants assert that officers Hornbuckle, Heron and Hale-Taylor all "testified that they were required to undergo training at the Jail for various topics including but not limited to first aid, use of force, suicide prevention, inmate interaction, and fire safety." Doc. Ent. 33 at 15. Notwithstanding *City of Los Angeles*, defendants contend that WCJ has a policy on inmate lockdown procedures (Doc. Ent. 33-13), and that it "requires the officers to warn the inmates prior to opening and closing the doors." Doc. Ent. 33 at 24 n.4. With respect to Division II, described by defendants as "the old jail," WCJ's Inmate Lockdown Procedure No. 14.3 provides that "[t]he Floor Security Officers will advise the inmates to prepare for lockdown[,]" and "[t]he Floor Security Officers notify the inmates that the doors will be closing and to keep body parts clear of the doors." Doc. Ent. 33-13 ¶¶ 2a, 2b; Doc. Ent. 33 at 10. It also provides that "[w]hile one officer works the locking mechanism, the other officer walks down the outside catwalk[,]" and "[t]he officer walking down the catwalk during the lockdown will make sure that all inmates are in their proper cells, and update the IMS Status Board." Doc. Ent. 33-13 ¶¶ 2c, 2d.

In his response, plaintiff essentially argues that ¶¶ 2c, 2d were not followed in this case. Doc. Ent. 37 at 7, 16, 18. Heard agreed that "there are different lockdown procedures for

28

different situations[.]" Presumably referring to the WCJ Inmate Lockdown Procedure No. 14.3, Heard explained, the procedure "is very specific to a particular set of circumstances, for very specific purposes that are driven by our laws of the State of Michigan, about high-security inmates particularly, and these are the inmates that are in Division 2."  Doc. Ent. 37-1 p. 65.  He stated that ¶¶ 2a & 2b are "always applicable to whenever inmates are locked in their cells in Division 2, because it is a fundamental component of ensuring that there's no harm done to them[,]" and that "the totality of this policy did not apply to that particular circumstance."  Heard also testified that "the officers do know that they are to prepare and advise the inmates that the doors will be closing and to keep body parts clear of the doors.  That clearly is in this policy."  Furthermore, Heard stated, "the policy is written to give the deputies guidance as to what they're to do under certain circumstances.  The clear circumstance that presented to them required them to close the doors; they, therefore, are clearly following the policy, that they notify the inmates and they are telling them to keep their body parts clear of the doors."  Doc. Ent. 37-1 pp. 72-73.

Heard agreed that an officer on the catwalk can see an inmate sleeping if his head is faced to the cell doors and that the officer operating the doors cannot look into each individual cell to see the inmate.  Doc. Ent. 37-1 pp. 33-34.  He also agreed that the vantage point from the catwalk "is a better vantage point to look into each individual cell[.]"  But, he stated, it is not better "to determine that the inmate in that cell has any body, part of their body that could be across the rail where the doors run."  Heard explained that the catwalk vantage point is worse, because the vantage point of the deputy who is running the doors has "got a point of view down the catwalk where he's able to see protrusions a whole lot better.  The depth perception, I'm saying, you've been there, the depth perception is not that good for an inmate in that cell when

you're on the outside of the catwalk." Doc. Ent. 37-1 pp. 34. Heard stated that "[f]or purposes of running the door, the best point of view is the officer running the doors, looking down the catwalk." However, Heard admitted that this officer "cannot see into the individual cells[.]" Doc. Ent. 37-1 at 35. However, he stated that the officer standing on the catwalk "can see directly into each cell[.]" Doc. Ent. 37-1 p. 36.

Heard agreed that the purpose of the officer on the catwalk is "to just ensure that there's one inmate per cell[.]" Doc. Ent. 37-1 p. 43. He also agreed that "if [the] officer standing on the catwalk, when this lockdown procedure is being executed, sees that there is an inmate that has the potential to be hurt, he would notify the individual who's operating the cell doors[.]" Doc. Ent. 37-1 pp. 43-44.

Presumably referring to WCJ Inmate Lockdown Procedure No. 14.3, Heard stated, "the intent of this policy clearly is not intended for that type of very limited, you know, purpose of trying to correct a maintenance problem or a public health problem in the housing unit." Doc. Ent. 37-1 at 59. When Heard was asked "[w]hat is the main safety component portion of this policy to prevent injuries to inmates when the doors are opening and closing?" He answered,

> There must be a very clear enunciation by the officer that the doors are going to be run. The officer who's operating the door mechanism is to provide – is to conduct visual observation to see that there's no appearance of any inmate's body, any part of the inmate's body protruding in a manner that the door mechanisms could cause injury or harm. And all they can do is, from that vantage point, the best position to be in, to make that determination, having done it myself and having seen it done as the Chief of Jails, is from that perspective. That is clearly the best perspective to make that determination that it is safe to run the doors.

Doc. Ent. 37-1 pp. 59-60.

30

Plaintiff contends that the WCJ inmate lockdown policy, "when implemented in its entirety, would provide the meticulous observation of the inmates' positions within the cells and likely prevent any injury that may be caused from the doors opening or closing." However, even if plaintiff is correct that "[h]ad Wayne County trained its officers [to] implement and execute the policy in its entirety, injuries, including those sustained by plaintiff, would have likely been prevented[,]" and even if it were true that "Officer Hornbuckle and Wayne County chose to practice only portions of the lockdown procedure and in doing so, unnecessarily exposed plaintiff to injury[,]" Doc. Ent. 37 at 18, if the Court agrees with my foregoing conclusion that defendants are entitled to summary judgment on plaintiff's 42 U.S.C. § 1983 claim against Hornbuckle (Count I), then, under *City of Los Angeles*, the Court should also conclude that defendants are entitled to dismissal of plaintiff's 42 U.S.C. § 1983 claim against Wayne County (Count II).[15]

**3.     Defendants are entitled to summary judgment on Count III: Gross negligence against all defendants.**

**a.**     Plaintiff's gross negligence claim against both defendants (¶¶ 30-33) involves Mich. Comp. Laws 691.1407 ("Governmental immunity from tort liability"), specifically the subsection which provides:

> [E]ach officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by

---

[15]Fed. R. Civ. P. 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Plaintiff correctly notes that defendants' dispositive motion submits documents outside the pleadings. Doc. Ent. 37 at 11-12. However, because my recommendation with respect to Count II (the 42 U.S.C. § 1983 claim against defendant Wayne County) did not rely upon these matters, I have recommended dismissal of this claim under Fed. R. Civ. P. 12(b)(6).

31

the volunteer while acting on behalf of a governmental agency if all of the following are met:

> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

Mich. Comp. Laws § 691.1407(2).

Plaintiff alleges that "[d]efendants' failure to alert Plaintiff that the cell doors were closing at a time when the doors are customarily open, to ensure that Plaintiff was safely away from the closing cell door, and to be certain that the operation of the cell door would not jeopardize Plaintiff's personal safety illustrates Defendants' reckless conduct and lack of concern for whether an injury occurs and constitutes gross negligence." Doc. Ent. 21 ¶ 32.

**b.**     Gross negligence "means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(7)(a). "[F]or a plaintiff to be successful in a tort action against a governmental employee, the plaintiff must prove both that (1) the governmental employee's conduct demonstrated a substantial lack of concern for whether his conduct would cause injury to the plaintiff, and (2) the alleged misconduct was the proximate cause of the plaintiff's injury." *Tarlea v. Crabtree*, 263 Mich.App. 80, 83, 687 N.W.2d 333, 336 (2004). With respect to Mich. Comp. Laws § 691.1407(2)(c), "[t]he phrase 'the proximate cause' is best understood as meaning the one most immediate, efficient, and direct cause preceding an injury." *Robinson v. City of Detroit*, 462 Mich. 439, 459; 613 N.W.2d 307, 317 (2000).

"Though the issue whether a governmental employee's conduct constituted gross negligence under MCL 691.1407 is generally a question of fact, a court may grant summary disposition under MCR 2.116(C)(7) if, on the basis of the evidence presented, reasonable minds could not differ. *Tarlea*, 263 Mich.App. at 88, 687 N.W.2d at 338 (quotations and footnote omitted).

"[E]vidence of ordinary negligence does not create a material question of fact concerning gross negligence. R[ather], [a plaintiff] must adduce proof of conduct 'so reckless as to demonstrate a substantial lack of concern for whether an injury results.'" *Maiden v. Rozwood*, 461 Mich. 109, 122-123, 597 N.W.2d 817, 824 (1999) (internal footnote omitted). "The much less demanding standard of care-gross negligence-suggests, instead, almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks. It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Tarlea*, 263 Mich. App. at 90, 687 N.W.2d at 339-340.

**c.**     Defendants argue that plaintiff's gross negligence claim fails, "because there is no evidence that the Deputy's conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury would result, and because Plaintiff's own negligence was the proximate cause of the injury." Doc. Ent. 33 at 21-22. Specifically, defendants contend that plaintiff "cannot establish that Deputy Hor[n]buckle engaged in wanton misconduct such that there was a willingness to injure him with the cell doors[,]" and "cannot establish that Hornbuckle was the proximate cause of [plaintiff's] injury." Doc. Ent. 33 at 22.

33

d.     Plaintiff specifically responds that "[t]here is a question of fact regarding whether Deputy Hornbuckle's conduct was grossly negligent."  Doc. Ent. 37 at 12-15.  In support of this argument, plaintiff cites several cases.  Doc. Ent. 37 at 13-14.  In *Johnson v. Wayne County*, 213 Mich. App. 143, 540 N.W.2d 66 (1995), plaintiff had claimed intentional infliction of emotional distress.  With respect to Mich. Comp. Laws § 691.1407(2)(c) and "gross negligence," the Court stated:

> . . . the deputy sheriffs involved placed plaintiff in a holding cell with Marshall. Plaintiff had been a juror on Marshall's case for two weeks and Marshall was charged with five counts of first-degree murder in a highly publicized case in the City of Detroit. Plaintiff was in the holding cell with Marshall on two separate occasions and they were handcuffed together and taken to the Wayne County Jail where they were again placed in the same jail cell. While in the holding cell, plaintiff stated that deputy sheriffs looked inside the window and laughed and pointed at her.
>
> Reasonable minds could differ with regard to whether the actions of the defendants were so reckless as to demonstrate a substantial lack of concern for whether an injury resulted. Thus, plaintiff has presented sufficient evidence, if believed by a rational trier of fact, to show that defendants acted in a grossly negligent manner so that they are not covered by governmental immunity.

*Johnson*, 213 Mich. App. at 159, 540 N.W.2d at 73.  In *Kendricks v. Rehfield*, 270 Mich. App. 679, 716 N.W.2d 623 (2006), the Court stated:

> . . . we cannot agree that holding plaintiff without investigating the claim for seven months was even remotely reasonable. This man remained incarcerated for over half a year because of this grievous error. We therefore agree with the trial court because we find sufficient indicia of gross negligence to create a genuine issue of material fact, and therefore find summary disposition on the ground of governmental immunity inappropriate. We believe reasonable jurors could reach the conclusion that defendants were grossly negligent.
>
> Plaintiff alleged that when he was arrested by Livonia officers he informed them that his twin brother was in fact the person they sought. The officers ignored plaintiff's claim of mistaken identity, and plaintiff was held in jail pending trial for seven months until his claim of mistaken identity was confirmed. Defendants had access to fingerprints and photographs of both plaintiff and his brother

34

throughout the seven months, and could have easily confirmed plaintiff's identity with this readily accessible information. Defendants' failure to investigate plaintiff's claim of mistaken identity certainly caused an egregious injury, here seven months of deprivation of freedom. The question of whether the officers' conduct demonstrated a sufficient lack of concern to constitute gross negligence is a question for a trier of fact. We therefore cannot conclude that defendants were immune from liability and were entitled to summary disposition.

*Kendricks*, 270 Mich. App. at 682-683, 716 N.W.2d at 625.  In *Boone v. Rieth-Riley Const. Co.*,

No. 285276, 2009 WL 3049732 (Mich. App. Sept. 24, 2009), the Court said the following with

respect to the "gross negligence" prong of Mich. Comp. Laws § 691.1407(2)(c):

A reasonable juror could conclude from this evidence that appellants displayed a willful disregard for the substantial risk that the trench posed and the suggested precautions and safety measures that could have ameliorated the danger. *See Tarlea v. Crabtree*, 263 Mich.App 80, 90; 687 NW2d 333 (2004). Evidence was presented that indicated that appellants were warned about the danger the trench posed, but chose to disregard the warnings because the suggested solutions were not part of the approved plan. Appellants told Reith-Riley that they could place barrels over the trench, but that they would not authorize further channeling of traffic with additional barrels. Also, although appellants left it to the contractor to place barrels over the trench if it was concerned with the safety of the shoulder, Harris indicated that placing these barrels would not have happened because Reith-Riley would not be compensated unless a change was made to the traffic plan. Here, the people who would have approved the change had indicated that the additional barrels were not needed. Thus, a jury could conclude that an apparent solution (namely, placing barrels over the trench) was really no solution at all. Arguably, appellants' actions were not just passive in nature, *see Rakowski v. Sarb*, 269 Mich.App 619, 633; 713 NW2d 787 (2006), and were driven by concerns other than the safety of the motorists who would be traveling over the Holt Road exit.

*Boone*, 2009 WL 3049732 at *3.  Finally, plaintiff relies upon *Seagraves v. Braman*, No.

274996, 2007 WL 4463958 (Mich. App. Dec. 20, 2007), wherein the Court observed the

following with respect to "gross negligence[:]"

When the incident occurred, there is evidence that defendant was in charge of plaintiff's care since Braman alleged that he asked defendant to care for plaintiff while he stepped away to use the restroom. Thus, there is evidence that defendant was solely responsible for plaintiff's supervision at the time of the incident. There

35

is also evidence that defendant was aware of MPC's [Mount Pleasant Center's] policy regarding the "hands-on" level of supervision plaintiff required at all times while outside of MPC. There is also evidence in the record that defendant knew that plaintiff had an affinity for the smell of gasoline and an inclination to wander to cars when unattended. Record evidence shows that the area where plaintiff sat outside the facility fronted on Pickard Street where buses and other automobiles regularly traveled. Further, there is evidence that defendant carried a Personal Protection Device with her that she could have used to call for assistance when she left plaintiff to tend to the wheelchair mishap.

This case contains evidence that defendant affirmatively walked away from plaintiff leaving him unattended near a street regularly used for vehicular travel without regard for: plaintiff's serious mental disability rendering him helpless, his past conduct exhibiting a propensity to wander to cars and the smell of gasoline, and the MPC "hands on" policy. There is also evidence that defendant had access to a communication device that she could have used to call for assistance, yet she did not. The evidence reveals that defendant was not attentive to her duties with regard to plaintiff's care and supervision. In fact, her affirmative actions suggest a willful disregard of precautions or measures to tend to plaintiff's safety as well as a singular disregard of substantial risks well known to her. *Tarlea*, supra at 90. As such, we conclude that the evidence presented was sufficient to create a question of fact regarding whether defendant exhibited "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(7)(a); *Xu [v. Gay*, 257 Mich. App. 263, 269, 668 N.W.2d 166 (2003)].

*Seagraves*, 2007 WL 463958 at *3 (footnote omitted).

Plaintiff also refers to defendant Hornbuckle's July 15, 2010 deposition, making the same arguments he makes in support of his argument that there is a question of fact with regard to whether Hornbuckle's conduct was grossly negligent. *Compare* Doc. Ent. 37 at 14-15 and Doc. Ent. 37 at 15. According to plaintiff, "[a]ll of this creates a question of fact on the issue of gross negligence[,]" which is an issue for the jury to decide. Doc. Ent. 37 at 15.

**e.**    Upon consideration, the Court should conclude that defendants are entitled to summary judgment on plaintiff's gross negligence claim, because the evidence does not support a conclusion that Hornbuckle's conduct "demonstrated a substantial lack of concern for whether

his conduct would cause injury to the plaintiff[.]" *Tarlea*, 263 Mich.App. at 83, 687 N.W.2d at 336.

In support of their claim that plaintiff "cannot establish that Deputy Hor[n]buckle engaged in wanton misconduct such that there was a willingness to injure him with the cell doors[,]" defendants look to Hornbuckle, Heron and Orvis's deposition testimony.  Doc. Ent. 33 at 22.  At his deposition, Hornbuckle testified that he did not want this injury to occur to Orvis.  Doc. Ent. 33-9 p. 91.  As noted above, Hornbuckle also testified that, "[s]everal times or more" he called out that the bars were closing, Doc. Ent. 33-9 pp. 59-60; when Heron was asked, "How many times did [Hornbuckle] notify the inmates that he was about to or is closing the cell doors?"  Heron replied, "I would say between two to three times[;]" Doc. Ent. 33-11 p. 30; and, when plaintiff was asked, "[i]s it possible that [Hornbuckle] called it out and you didn't hear it because of the medication you were on?"  Plaintiff answered, "Possible I guess[,]" Doc. Ent. 33-2 p. 26.  Furthermore, in addition to the aforementioned exchange during which Orvis stated he did not have any evidence that Hornbuckle intended for this to happen to plaintiff (Doc. Ent. 33-2 p. 35), Orvis could not recall having had any problems or arguments in the past with Hornbuckle, and Orvis testified that Hornbuckle "[s]eemed like a pretty decent guy."  Doc. Ent. 33-2 p. 34.  In a tape-recorded statement given to internal affairs three days after the incident (July 24, 2006), plaintiff characterized the incident as "[j]ust a freak accident.  I know I'm sure the deputy didn't mean to do it."  *See* Doc. Ent. 33-2 p. 37; Doc. Ent. 33 at 22; *see also* Doc. Ent. 33-3 (CD recording of Orvis's partial Internal Affairs Interview).

My conclusion is unchanged by plaintiff's case citations.  In *Johnson*, plaintiff claimed the officers laughed and pointed at her.  In *Kendricks*, the officers ignored plaintiff's mistaken

identity claim and he spent seven months in jail.  In *Boone*, appellants were warned about the danger but chose to disregard the warning.  And, in *Seagraves*, defendant affirmatively walked away from plaintiff and was not attentive to her duties.  By comparison, there is no evidence that Hornbuckle exhibited "almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." Tarlea, 263 Mich. App. at 90, 687 N.W.2d at 339-340.  In other words, based upon the evidence pointed out by the parties, "if an objective observer watched [Hornbuckle], he could [not] conclude, reasonably, that [Hornbuckle] simply did not care about the safety or welfare of those in his charge." *Tarlea*, 263 Mich. App. at 90, 687 N.W.2d at 339-340.

This conclusion is buttressed by defendants' showing that "[i]n his entire career at the jail, Deputy Hornbuckle has never been disciplined, never used force, nor has he ever been written up for any misconduct.  In fact, he was assigned to the most difficult inmates on the highest security wards because of his ability to manage the inmates who otherwise were having behavioral problems[,]" in support of which defendants cite Hornbuckle's deposition (Doc. Ent. 33-9 pp. 14-17)[16] and portions of his personnel file, most of which is dated 2001/2002 (Doc. Ent. 33-10).[17]  Doc. Ent. 33 at 13.

**f.**      In support of their claim that plaintiff "cannot establish that Hornbuckle was the proximate cause of [plaintiff's] injury[,]" defendants look to Orvis's deposition testimony.  Doc.

_____

[16]At his July 15, 2010 deposition, Hornbuckle stated that his probation period lasted four (4) to five (5) weeks, during which time he did not have any incidents or problems.  When asked whether he was "aware of any sort of negative feedback or negative write-ups[,]" Hornbuckle answered, "[n]ever, never.  You can question the inmates, they'll tell you about me." Doc. Ent. 33-9 at 14-17.

[17]One of the items is a February 24, 2006 Law Enforcement Certificate (Doc. Ent. 33-10 at 3) and another item is a January 22, 2003 letter regarding perfect attendance (Doc. Ent. 33-10 at 4).

Ent. 33 at 22.  During his deposition, Orvis agreed that he had gone into the WCJ many times and that he had probably spent more time at Division II, the old jail.  Doc. Ent. 33-2 pp. 15-16.

Orvis testified about the operation of the cell doors.  Orvis agreed that "based on the fact that [he had] been an inmate or at least an inmate at the [WCJ] a significant number of times, [he was] more than familiar with when the doors are opening and closing."  Doc. Ent. 33-2 pp. 20-21.  He also testified that, "normally, you'd hear the bars, you know, close and open, whatever they're doing . . . You hear them slam shut."  Doc. Ent. 33-2 pp. 21-22.

It is defendants' position that, "[b]ecause of Orvis's extensive experience in the jail, his familiarity of the operation of the doors, and his admission that he heard the doors as they were closing, a reasonable inference can be drawn that he was negligent in failing to stay clear of the bars."  Doc. Ent. 33 at 22.[18]

Plaintiff responds that "[t]here is *at least* a question of fact regarding whether Deputy Hornbuckle's gross negligence was the proximate cause of Mr. Orvis's injury."  Doc. Ent. 37 at 15-16.  It is plaintiff's position that defendants' argument regarding proximate cause "is incorrect."  According to plaintiff, "[t]here is *at least* a question of fact regarding whether Deputy Hornbuckle's conduct was the proximate cause of Mr. Orvis's injury."  Doc. Ent. 37 at 16.

---

[18]In support of their claim that "Orvis knew the cell doors were closing[,]" defendants cite the Jail Records of Admission (Doc. Ent. 33-8).  This exhibit includes the August 12, 2010 affidavit of Sandra Moore, wherein Moore attests that Orvis "has been admitted to the [WCJ] 56 times over a 12 year period[,]" (Doc. Ent. 33-8 at 2-3) and a Wayne County Jail System History of Inmate Report for Orvis (Doc. Ent. 33-8 at 4-60).

However, if the Court agrees with my conclusion as to the first prong of the *Tarlea* test, then the Court need not address whether "the alleged misconduct was the proximate cause of the plaintiff's injury." *Tarlea*, 263 Mich.App. at 83, 687 N.W.2d at 336.[19]

## III.   NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address

---

[19]I note that, on June 17, 2010, plaintiff filed a request for expert services.  Specifically, plaintiff asked that the Court pre-approve the retention of Dr. James Houston as an expert and permit plaintiff's counsel "to be reimbursed the charges incurred through Dr. Houston's retention and work in this matter[.]"  Doc. Ent. 31.

This request has not yet been ruled upon by the Court.  However, I note that plaintiff's November 10, 2010 response (Doc. Ent. 37) to defendants' dispositive motion (Doc. Ent. 33) does not argue that pre-approval of Houston's retention was necessary to properly respond to defendants' dispositive motion; therefore, this report and recommendation has been formulated without consideration to plaintiff's June 17, 2010 filing (Doc. Ent. 31).

specifically, and in the same order raised, each issue contained within the objections.

<u>s/Paul J. Komives</u>
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 2/23/11

The undersigned certifies that a copy of the foregoing
order was served on the attorneys of record and  by
electronic means or U.S. Mail on February 23, 2011.

<u>s/Eddrey Butts</u>
Case Manager

41